# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| KRISTIN W.,[1] *Plaintiff,* v. KILOLO KIJAKAZI, *Defendant.* | No. 3:22-cv-594 (VAB) |

## RULING AND ORDER ON MOTIONS REGARDING THE COMMISSIONER'S DECISION

Kristin W. ("Plaintiff") has filed this administrative appeal under 42 U.S.C. § 405(g) against Kilolo Kijakazi, the Acting Commissioner of Social Security ("Defendant" or "the Commissioner"), seeking to reverse the decision of the Social Security Administration denying her claims under Title II of the Social Security Act. Compl. ¶ 1, ECF No. 1.

Plaintiff has moved for an order reversing the Commissioner's decision, or in the alternative, vacating and remanding, while the Commissioner has moved for an order affirming the decision. *See* Pl. Mot. to Reverse the Decision of the Comm'r, ECF No. 13 ("Pl. Mot."); Def. Mot. for an Order Aff'ing the Decision of the Comm'r, ECF No. 16 ("Def. Mot.").

For the following reasons, Plaintiff's motion is **GRANTED**, and the Commissioner's motion is **DENIED**. The decision of the Commissioner is **VACATED** and **REMANDED** for further proceedings consistent with this Ruling and Order.

---

[1] In opinions issued in cases filed under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), this Court will identify and reference any non-government party solely by first name and last initial in order to protect the privacy interests of social security litigants while maintaining public access to judicial records. *See* Standing Order – Social Security Cases (D. Conn. Jan. 8, 2021).

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background

#### 1.   Pre-Onset Medical History

From September 26, 2000 to October 21, 2000, Kristin W. was an in-patient at the William Beaumont Hospital – Royal Oak in Michigan. Pl. Statement of Material Facts, ECF No. 13-1, ¶ 4 ("Pl. Facts"). She was recorded as having "1. Upper abdominal and flank pain due to hereditary coproporphyria, improved with Hematin. 2. Phlebitis of the left cephalic vein. 3. Spontaneous hematoma of the right breast, lower outer quadrant." *Id.* Kristin W. was admitted at the William Beaumont Hospital again on November 15, 2000. *Id.* She had "recurring abdominal pain, unrelieved by Vicodin" and "also ha[d] a history of chronic migraines [and] was diagnosed with an Arnold-Chiari malformation per CT two years ago while she was investigated for her headaches." *Id.*

From December 27, 2000, to January 10, 2001, Kristin W. was again an in-patient at the William Beaumont Hospital. *Id.* ¶ 5. Her discharge diagnosis was "Hereditary Coproporphyria" with a Secondary Diagnosis of "1. Equivocal pancreatitis. 2. Migraine headache. 3. Benign neoplasm of the pituitary gland. 4. Irregular menses. 5. Hypothyroidism. 6. Gastroesophageal reflux disease. 7. History of deep vein thrombosis." *Id.* At the time of this hospitalization, she had elevated pancreatic enzymes. *Id.* Her migraines were resolved with a steroid course. *Id.*

In April 2002, Kristin W. had a bone marrow biopsy. *Id.* ¶ 6. The pathologist wrote "Normocellular marrow with trilineage hematopoiesis [and] Normoblastic erythropoiesis consistent with myelodysplastic syndrome, refractory anemia." *Id.* [need cite]

On May 7, 2001, Kristin W. had a bone scan, which revealed abnormalities. *Id.*

On September 10, 2001, Kristin W. was diagnosed with "1. Recurrent severe diffuse abdominal pain due [to] hereditary coproporphyria. 2 Myelodysplastic syndrome (refractory anemia). 3. Pituitary microadenoma. 4. Migraine. 5. Suspected evolving collagen-vascular disease." *Id.* ¶ 7. Diagnosing physician Dr. Vidal Borromeo stated "because of the disabling and recurrent nature of coproporphyria, she was unable to work more than two to three weeks between hospital admissions. These two severe medical problems [hereditary coproporphyria and myelodysplastic syndrome] will remain with her for the rest of her life unless a radical cure is found for both conditions. Most recent admission was 08/29/2001 for recurrent severe abdominal pain due to coproporphyria and for fever due to staphyloccal bacteremia." *Id.* Dr. Borromeo additionally stated that "1. The emerging pattern of porphyria appears to be of the early onset stepladder-fatal type. This is associated with shortened lifespan. 2. Median survival of refractory anemia is 37 months; range 19-64 months." *Id.*

On November 27, 2001, Kristin W. returned to the William Beaumont Hospital for parethesias. *Id.* ¶ 8. Tests for the upper extremity electrodiagnostics were normal, but tests for the lower extremity electrodiagnostics were abnormal. *Id.* The findings were "strongly suggestive of bilateral peripheral dysfunction in the lower extremities. The findings also suggest a possible conduction delay in the large fiber sensory pathways from lumbar point to the cortex on right side stimulation." *Id.*

From January 29, 2002 to February 11, 2002, Kristin W. was again at the William Beaumont Hospital for another "severe abdominal pain crisis due to hereditary coproporphyria." *Id.*

From January 27, 2003 to February 19, 2003, Kristin W. was yet again at the William Beaumont Hospital for "severe abdominal pain due to hereditary coproporphyria." She was

diagnosed with "Autonomic neuropathy with gastroparesis due to hereditary coproporphyria and tachycardia due to hereditary coproporphyria." *Id.* ¶ 9.

On May 6, 2004, Kristin W. had a whole body bone scan and findings were "consistent with myelofibrosis." *Id.* ¶ 10.

On January 3, 2005, Kristin W. had another scan, and findings suggested "extramedullary hematopoiesis in the diploic space of the calvarium." *Id.*

In February 2016, Kristin W. was diagnosed with lupus. Certified Administrative Record, ECF No. 7 ("Tr.") at 2476.

On February 6, 2017, Kristin W. went to the Hospital for Special Care for a physical therapy services evaluation for three months of left hip pain. Pl. Facts ¶ 11. She successfully completed a therapy course that ended in May 2017. *Id.*; Tr. at 2503.

On January 2, 2018, Kristin W. went to the Hartford Hospital Pain Treatment Center for follow-up on her lupus. Pl. Facts ¶ 12. She "was still having abdominal pain diarrhea, nausea and vomiting [citation to Tr. at 1494] as well as arthralgias, myalgias, back pain, and headaches." *Id.* Dr. Michael J. Grille saw her and noted "Thoracic degenerative disc disease and arthropathy of thoracic facet joint [citation to Tr. at 1496]. It appears that she had been on prescribed methadone and oxycodone for pain relief for an extended period of time prior to the January 2, 2018." *Id.*

On February 19, 2018, Kristin W. saw Dr. Grille again and he noted, "She is tearful today. She is experiencing a lupus flare as well as recurrent jaw pain (prior surgery)." Tr. at 1488.

On March 25, 2018, Kristin W. saw Dr. Xuemei Dong at the Yale Lupus Program for an initial evaluation. Pl. Facts ¶ 21.

On April 3, 2018, Kristin W. had an annual OB/GYN exam in which notes indicate she was "still on Lybrel, has C diff . . . unable to tolerate lupus treatment." *Id.* ¶ 12.

On April 18, 2018, Kristin W. went to UConn Health and saw Dr. Faryal S. Mirza for osteoporosis. *Id.* ¶ 13. Dr. Mirza noted she had a history of vertebral compression fractures. Dr. Mirza also noted Kristin W. "was on Benlysta infusions which was stopped last year after C.diff infection. She has had C.diff infection since August 2017 and having a lupus flare. On prednisone 20 mg a day for most of last year. Currently on 5 mg a day. Trying to get the lowest dose to help her immune system." *Id.* ¶ 13; Tr. at 1480. Kristin W.'s Body Mass Index was also noted as within the obesity range. Pl. Facts ¶ 13; Tr. at 1483.

On May 9, 2018, Kristin W. went to Starling Physicians and saw Dr. Richard Quintiliani for her ongoing Clostridium difficile (C. diff) colitis, a condition that resulting in her "defecating five times a day with 'some lower abdominal cramping.'" Pl. Facts ¶ 14.

Also on May 9, 2018, Kristin W. went to the Hospital of Central Connecticut and saw Dr. Philip A. Micalizzi for seizure disorder. *Id.* ¶ 15 Dr. Micalizzi wrote "Seizures have been mixed in quality. [Kristin W.] has periods of being spacey and unresponsive. On other occasions there has been shaking with loss of consciousness. Prior EEGs completed in Michigan reportedly proved to be positive for epilepsy." Tr. at 1961. Dr. Micalizzi described the lupus as "problematic" and the arthralgias as "a significant problem." Pl. Facts ¶ 15.

On May 14, 2018, Kristin W. went to UConn Health and saw Dr. Beatriz E. Tendler because she was "struggling with a flare of [lupus]," she had "persistent diarrhea with +C.diff results," she complained of "skin rash and joint pain," she was "taking 29 specified medications," and she was requesting a GI referral, which was placed. *Id.* ¶ 16.

On May 25, 2018, Kristin W. went to Hartford Hospital Pain Treatment Center and saw PA Jason D. Milbert for "chronic back pain in the setting of systemic lupus erythematosus." *Id.* ¶ 17. PA Milbert noted "she has psychological factors that appear to contribute to her pain experience" and that "she is extremely distressed over health issues including chronic c. diff infection, [lupus], chronic pain and occupational stress." *Id.*

On June 19, 2018, Kristin W. went to Hartford Hospital Pain Treatment Center and saw Dr. Grille again. He gave her the diagnoses of "Chronic Pain Syndrome, Lumbar spondylosis, Systematic lupus erythematosus, Uncomplicated opioid dependence, [and] Greater trochanteric bursitis of both hips." *Id.* ¶ 18.

On June 22, 2018, Kristin W. saw her primary care physician, Dr. Michael Honor. Dr. Honor noted, "Feels she is having memory issues, history of porphyria, does have a Chiari malformation … has lupus. In last 9 months, memory has changed, feels it is affecting her work, she forgets what she was doing on computer screen. Is having stress. Is seeing a counselor for depression, but has been better." *Id.* ¶ 19.

On July 23, 2018, Kristin W. saw Dr. Micalizzi for cognitive decline, who adjusted her medications, noting, "Any cognitive changes that the patient is noticing are probably the result of multiple meds and perhaps compounded by her depression." *Id.* ¶ 20.

On July 27, 2018, Kristin W. saw Dr. Peter D. Byeff for evaluation of coproporphyria. *Id.* ¶ 22. Dr. Byeff noted "significant bruising" on abdomen and extremities and ordered "blood work including clotting studies to rule out a bleeding diathesis." *Id.*

On July 31, 2018, Kristin W. saw Dr. Joel Garsten, and he noted in his assessment "Gastroparesis with hx pyloric spasm, stable for now." Tr. at 378.

In early August 2018, Kristin W. asked Dr. Honor to complete a form for FMLA coverage. Pl. Facts ¶ 23. She saw Dr. Honor on August 3, 2018, and he noted, "Works from home, social worker … she has chronic diarrhea, only allowed 2 bathroom breaks a day. Has chronic pain, fatigue. She is slower than she used to be. She needs to be flexible with schedule." Tr. at 1328.

On August 28, 2018, Kristin W. saw Dr. Byeff again and he noted:

> Her factor VIII assay was elevated at 251% and [sic] normal. Her von Willebrand factor antigen was elevated at 263% of normal. Her von Willebrand factor activity was elevated at 290% of normal. Her serum protein electrophoresis revealed hypogammaglobulinemia. I discussed with her at length the implications of her elevated factor levels. I told her this put her at risk for DVT and pulmonary emboli. … I told her that I could anticoagulate her but that this would put her at risk since she has a history of some seizure disorders. She will consider the possibility of being anticoagulated.

Tr. at 1205-06.

On September 8, 2018, Kristin W. had an eye examination in which she was found to be experiencing vision problems "primarily at the computer range" as well as "floaters and headaches" and "photophobic sensation." Pl. Facts ¶ 25.

On September 24, 2018, Kristin W. went to Starling physicians and saw APRN Jennifer Silva for injuries from a fall outside her home in which she hit her head. *Id.* ¶ 26. APRN Silva noted, "She now has a bruise on her left hip and is having trouble sitting at work. . . .  She is complaining of headaches as well as ringing in her ears and stated she vomited once." Tr. at 1323.

On November 14, 2018, Dr. Micallizzi noted, "the patient continues to complain of confusion. This is probably the result of multiple factors including the use of multiple meds, including narcotic analgesics, depression, and perhaps 'lupus fog.'" *Id.* at 1981.

On December 10, 2018, Kristin W. saw Dr. Micallizzi, who noted that she had "not been tolerating her taper. . . . Her opioid taper is causing increased pain and reduced sleep. She is also tapering her Topamax and gabapentin due to cognitive issues." *Id.* at 1830.

### 2. Post-Onset Medical History

On January 9, 2019, Kristin W. claimed an onset of disability. Pl. Facts ¶ 28. Before this date, she was employed by United Healthcare as a social worker. *Id.*

On January 10, 2019, Kristin W. saw Dr. Honor who noted, "Feels she is not safe at work right now. Her c.diff is back. Cognitively she feels off, not thinking appropriately. She feels she needs to take leave from work. Is currently 5 weeks behind on her cases. She has 397 cases." Tr. at 1308. Dr. Honor recommended a leave of absence pending further diagnostic work. Pl. Facts ¶ 28.

On January 21, 2019, Kristin W. saw Dr. Jennifer Cromer, Ph.D., for a neuropsychological examination. Dr. Cromer wrote:

> Neuropsychological examination results reveal that the patient does in fact contend with cognitive weaknesses in the context of many cognitive and personality strengths. It is important to note that she is a very hard-working, conscientious individual who strives to do her best. While she is bright and demonstrates good problem-solving abilities, it takes her an excess amount of time in order to organize her thoughts and form a plan. Slow information processing speed is observed, seemingly partially due to personality characteristics (e.g., the tendency to be perfectionistic), but also due to neuropsychological reasons. Patient also demonstrates mild to moderately impaired complex attention and working memory, or the ability to hold information in her mind as she completes a task. Patient struggles to generate thoughts quickly and this is further impeded by stress proneness. Finally, dexterity is moderately impaired in her dominant (left) hand[.]

Tr. at 1405-07.

On February 5, 2019, Kristin W. went to the Hartford Hospital Pain Treatment Center for a change in medication from methadone to Belbuca (suboxone). Pl. Facts ¶ 29.

On February 14, 2019, Kristin W. saw Dr. Honor again, who noted "She is suicidal, Recurrent c. diff infections." *Id.*; Tr. at 1304.

On February 20, 2019, Kristin W. went to the Hospital for Special Care and saw Alaina Breitberg, Psy.D. for a psychological assessment. Pl. Facts ¶ 30. Dr. Breitberg noted "daily passive suicidal ideation," diagnosed "major depressive disorder, recurrent, severe without psychotic behavior," and wrote "Patient presents with severe depression with anxious distress in the context of recently diagnosed mild cognitive impairment and a history of chronic complex medical illness." *Id.*

On February 26, 2019, Kristin W. saw Dr. Cromer for "cognitive rehabilitation." *Id.* ¶ 31. On March 1, 2019, Dr. Cromer sent a letter regarding Kristin W.'s disability claim in which she wrote:

> [Kristin W.] is a master's level clinical, medical social worker with her own complex medical history that includes a myriad of problems Including (but not limited to): systemic lupus erythematosus, cutaneous lupus erythematosus, diffuse connective tissue disease, arthritis pain, chronic lower back pain, gastroparesis, single thyroid nodule, rheumatoid arthritis of the shoulder, and vestibular labyrinthitis. Furthermore, these conditions, which have caused immune system suppression, have rendered her vulnerable to frequent Infections (e.g., C-difficile, yeast, respiratory) . . .
>
> It would seem that [Kristin W.'s] concerns about her ability to work effectively and perform essential functions related to her position were well-founded given her variety of cognitive Impairments across multiple domains observed during evaluation. In spite of tremendous effort put forth, impairments with complex attention (e.g., multi-tasking), working memory, and fluency of thoughts were apparent. As the reader is likely aware, the ability to attend to multiple types of information at once is essential for task completion in her role as a medical social worker. [Kristin W.]

> found her cognitive deficits to be functionally impairing and
> interfering with her ability to complete calls to members in a
> timely and accurate manner. Because of working memory deficits
> she could not retain the information they provided without the
> extra step of writing down all information discussed. She found
> herself distracted and unable to handle the multi-tasking required
> to attend to instant messaging while simultaneously navigating
> member calls. Her slow information processing speed interfered
> with her ability to complete tasks in a timely manner. The
> combination of impaired working memory and slow information
> processing speed made it challenging to complete required training
> materials which were delivered online and without the ability to
> study them repeatedly, which was necessary for remembering.
> Over time, the cumulative effect was that [Kristin W.] fell quite
> behind in completing her calls and other documentation
> requirements. She recognized that the former was an unacceptable
> healthcare practice . . .

Tr. at 1387-89.

On March 4, 2019, Kristin W. went to UConn Health and saw Dr. Michael Rayel for

psychiatric evaluation and medical management. Pl. Facts ¶ 32. Dr. Rayel noted, "She has been

feeling more depressed daily associated with neurovegetative signs and symptoms such as

interrupted sleep and impaired energy, appetite and concentration." Tr. at 449-50. Dr. Rayel also

noted a recent increase in suicidal ideation. Pl. Facts ¶ 32. He diagnosed Kristin W. with "1.

GAD (Generalized Anxiety Disorder); 2. Current moderate episode of major depressive disorder

without prior episode; [and] 3. Persistent depressive disorder." Tr. at 456.

On March 5, 2019, Kristin W. went to the Hartford Health Pain Treatment Center and

saw APRN Krista W. Maloney, who diagnosed her with "1. Migraine without aura and without

status migrainosus, not intractable; 2. Lumbar spondylosis; 3. Arthropathy of thoracic facet joint;

4. Chronic pain syndrome; 5. Chronic bilateral low back pain with left-sided sciatica; 6. Chronic

bilateral low back pain without sciatica; 7. Myofascial pain; 8. Systematic lupus erythematosus,

unspecified SLE type, unspecified organ involvement status; [and] Lateral epicondylitis of left elbow.*" Id.* at 1818.

On March 18, 2019, Kristin W. saw Dr. Rayel for a follow-up, and trazadone was prescribed was increased to aid sleep. Pl. Facts ¶ 35.

On March 21, 2019, Kristin W. saw Dr. Honor for a follow up visit, and he noted, "she is still suicidal and depressed. [S]he feels she cannot go back to work, still suicidal. [S]till seeing GI for chronic diarrhea. [D]r. Wang does support her going on disability. [S]he feels she will harm people[.] [T]hey need documentation that she can not work. [N]urse case worker feels she can go back. [N]eeds something stating why she can't return to work[.]" Tr. at 1297. Dr. Honor also noted, "It seems to me that the patient's current mental state is certainly not conducive to her performing her current job in a safe way. I am going to recommend that she not yet return to her work until things have been more sorted out and improved regarding her depression and any possible cognitive issues that she may be having." *Id.* at 1301. Dr. Honor wrote a letter, dated March 21, 2019, addressing Kristin W.'s disability in which he stated, in part, "[Kristin] clearly does not have the ability at this particular time to maintain that type of focus at her job. In fact, I think that [Kristin] is probably putting her clients at some risk because of her inability to properly perform her job. As such, I absolutely feel that [Kristin] is not currently able to perform her job because of the disability related to her active multiple medical problems and the resultant severe depression that she is suffering from." *Id.* at 1370.

On March 25, 2019, Kristin W. saw Dr. Rayel, who wrote,

> Lately, she is going through significant stressors. She has multiple medical problems and financial issues with significant debt. Due to ongoing stresses, she reports worsening depression and anxiety. In fact in the last few days, she has been feeling suicidal with a plan to jump off a 4-story building. If she cannot jump, she says that she

> will overdose on her multiple medications. Her functioning has
> declined as well.
>
> On evaluation today, she is very tearful and expresses significant
> depression with intensifying suicidality. When asked about intent,
> she plans to act on it if her short-term disability application will be
> denied as she feels seriously desperate. After discussing treatment
> options, she has finally agreed to be hospitalized but initially very
> ambivalent about it.
>
> Family History: Her mother committed suicide by burning herself
> to death.

*Id.* at 488. Upon this visit, Dr. Rayel sent Kristin W. to the Emergency Room for psychiatric

admission*, id.* at 493, and where she remained as an in-patient until she was discharged on

March 29, 2019. Pl. Facts ¶ 38.

On April 3, 2019, Kristin W. went to UConn Health and saw APRN Zoanne W. Vollono

for psychiatric services for her depression and anxiety. *Id.* ¶ 39.

On April 8, 2019, Kristin W. went to UConn Health and saw Dr. Glenn Konopaske for

medication management. *Id.* ¶ 40.

On April 17, 2019, Kristin W. saw Dr. Breitberg because she was doing the IOP

(intensive outpatient program) at UConn Health. *Id.* ¶ 41.

On April 19, 2010, Kristin W. saw Dr. Beatriz Tendler for hypertension and thyroid

dysfunction. *Id.* ¶ 42.

On May 1, 2019, Kristin W. saw Denise DeSimone, LCSW, who wrote,

> Kristin remains extremely anxious and just starting to grieve her
> mother's death (suicide by fire) as well as all of her medical issues
> she is dealing with. I can't speak to the Medical issues yet I'm
> extremely concerned about her psychiatric instability and ability to
> work at all.
>
> Kristin is very triggered by voices, smell and active flashbacks
> which are occurring daily. She has been medicated on Effexor XR

(depression and anxiety), Topamax (for flashbacks and anxiety) and Trazadone (for sleep). The UCONN team feels that once she is discharged from our program, she will receive a referral to an EMDR therapist twice weekly for ongoing psychiatric issues and potential stabilization. She is extremely fragile and vulnerable, and would not be able to function in any work environment.

At this point, the UCONN team is recommending she not return to work until she completes a minimum of 6 months of treatment (maximum 1 year). The team is not recommending part-time or even a modified schedule due to her ongoing psychiatric issues. We can't stress enough that Kristin's medical, cognitive and psychiatric co-morbidities make it impossible for her to function in any type of work environment.

Tr. at 1360.

On May 6, 2019, Kristin W. saw Dr. Rayel for Generalized Anxiety Disorder and Severe episode of recurrent major depressive disorder, Pl. Facts ¶ 45, as well as APRN Maloney for pain. *Id.* ¶ 47.

On May 8, 2019, Kristin W. saw Dr. Honor, who noted that her medical issues seemed to have improved after her short term disability was approved. *Id.* ¶ 48.

On May 13, 2019, Kristin W. saw Dr Cromer again, who wrote her another letter much like the previous letter Dr. Cromer wrote on March 19, 2019, noted above. Tr. at 1387-89, 1629-31. Again, Dr. Cromer writes, "at this exact moment she is incapacitated by a multitude of cognitive, emotional, and physical factors and she is unable to complete job-related duties. *Id.* at 1631.

On May 22, 2019, Kristin W. saw Dr. Micalizzi, who noted, "Migraines have been more frequent of late. They have increased in frequency from once per month to once per week. Kristin did, however, decrease her Topamax dose from 25 mg bid to a once a day regimen. Back pain, and pain associated with lupus, continues to be problematic as well. … [Kristin W.] has

also suffered from severe depression with suicidal ideation. She is now feeling much better and she is following with psychiatry and psychology." Pl. Facts ¶ 49.

On June 1, 2019, Kristin W. had a sleep study performed, but the "study did not explain her excessive daytime sleepiness." *Id.* ¶ 50.

On June 6, 2019, Kristin W. went to the Hartford Health Pain Treatment Center for migraines. *Id.* ¶ 51.

On June 14, 2019, Kristin W. saw Dr. Moshe Zutler, a practice partner of Dr. Honor, for sleep issues and excessive daytime sleepiness and fatigue. *Id.* ¶ 52.

On June 26, 2019, Kristin W. resumed physical therapy for her left elbow after pain returned following an injection. *Id.* ¶ 53.

On June 28, 2019, Dr. Breitberg prescribed Kristin W. an emotional support animal. *Id.*

On August 27, 2019, Dr. Breitberg noted that Kristin W. had physical pain from trying to write. *Id.* ¶ 54.

On September 30, 2019, Kristin W. went to the Hartford Health Pain Treatment Center for chronic low back pain with bilateral sciantica and chronic right shoulder pain. *Id.* ¶ 55.

On October 9, 2019, Kristin W. was evaluated for physical therapy because of on-going right shoulder pain. *Id.* ¶ 56.

On November 20, 2019, Kristin W. saw Dr. Micalizzi for migraine headaches. *Id.* ¶ 58. Dr. Micalizzi noted, "headaches are rated as being 7-8/10 in degree on average. They tend to be associated with clenching of the jaw, visual scotomas, and nausea. Aggravating factors include light and loud noise exposure. The pain can be alleviated to some extent by rest in a dark setting." *Id.*; Tr. at 1986.

On December 16, 2019, Kristin W. saw APRN Maloney at the Hartford Health Pain Treatment Center. Pl. Facts ¶ 59.

On February 25, 2020, Kristin W. had an occupational therapy evaluation for her hand, mid-low back and left him, and she got a splint for her left elbow two days later. *Id.* ¶ 60.

On March 4, 2020, Dr. Breitberg noted that Kristin W. had "chronic pain ongoing with reports of GI distress and increased inflammation due to lupus." *Id.*

On March 26, 2020, Kristin W. saw APRN Maloney virtually through tele-medicine, and Kristin W. reported reduced sensation on the big toe of the right foot. *Id.* ¶ 61.

On June 3, 2020, Kristin W. was discharged from occupational therapy, which noted, "handwriting: fatigues quickly with standard pen; using more online bill pay services. Use computer/typing: Fatigued and decreased accuracy." *Id.* ¶ 63.

On June 9, 2020, Kristin W. saw Dr. Breitberg for a follow-up neuropsychology re-evaluation because "it has been 1 year and patient feels her cognition has not improved." *Id.* ¶ 64.

On June 30, 2020, Dr. Breitberg noted "Patient continues to present with limited ability to cope with daily stressors without experiencing significant psychological distress related to chronic severe PTSD." *Id.* ¶ 65.

On July 2, 2020, Kristin W. saw Dr. Cromer, who wrote,

> It is almost certainly the case that the patient's disordered immune system response is contributing to her neuropsychiatric status through a mechanism related to ongoing blood vessel inflammation and its impact on white matter integrity. Furthermore, on any given day her cognitive status might be negatively impacted by quality of sleep, chronic pain, and/or medication use.
>
> In addition, it is apparent that the patient continues to contend with vulnerability to mood dysregulation and elevated physiological arousal. Patient is very prone to anxiety and becomes hyper-

aroused easily when presented with a stressor. It seems highly probable that these propensities are also directly related to a central nervous system involvement of her autoimmune disease, in combination with her genetic vulnerability (e.g., her mother suffered from bipolar disorder).

This is an individual who is quite conscientious and anxiety-prone including generalized anxiety as well as PTSD related to her past traumas. Patient remains quite concerned that her cognitive weaknesses will compromise her work performance. This seems rightfully so as she works in a field where one cannot make errors. During the present evaluation, in spite of being quite motivated and careful, she still made errors and needed to exert exceptional effort in order to perform as well as she did. It is quite likely that in the community where there are substantially more distractions and information to be managed at once, the patient would struggle to do so.

It would seem in the patient's best interest to continue to engage in psychotherapy in order to learn strategies to reduce her physiological arousal and gain some mastery over her body's propensity to become hyper-aroused. She continues to be supported by a psychotherapist and is working on self improvement. Patient experienced numerous significant stressors during her lifetime including the tragic, traumatic death of her own mother. . . .

In my judgment, the patient is not in an emotionally stable place to return to work just yet. She is not yet equipped with strategies to manage her emotional well-being. It would seem that she has made strides over the past year between psychotherapy and obtaining a therapy dog, Chase, who elevates her mood and encourages movement which is necessary to reduce her pain. Still, this patient remains at risk for suicidality and depressed mood/vulnerability to vacillating mood and anxiety associated with difficulty regulating physiological arousal. When the patient gets distressed her cognitive status almost certainly worsens. It will be crucial that she implement the use of coping both preventatively/proactively as well as reactively in response to stressful situations.

*Id.* ¶ 67.

On July 21, 2020, Dr. Breitberg noted that suicidal ideation had increased because of Kristin W's Social Security application denial. *Id.* ¶ 68.

On August 19, 2020, Kristin W. saw Dr. Breitberg for a telemedicine session, and Dr. Breitberg noted, "Patient displayed hypervigilance when her dog made a noise. Patient was unable to soothe herself and required significant assistance in walking her through relaxation strategies." *Id.* ¶ 69.

On August 25, 2020, Dr. Breitberg noted, "Patient discussed ongoing anxiety and PTSD symptoms that greatly interfere with her ability to concentrate. Patient reported not being able to focus and/or recall simple daily tasks." *Id.* ¶ 70.

On October 27, 2020, Kristin W. saw Dr. John Votto at the Hospital for Special care for a pulmonary evaluation. Dr. Votto wrote:

> We had a long discussion about her history and I reviewed her sleep studies with her. It seems very possible that her polypharmacy is causing her dysfunctional sleep and that her lack of exercise and obesity complicates her other issues including chronic pain. I have told her that if she could be hospitalized for a prolonged period the best approach might be a drug holiday from any of her medications to see how she responds however since this is not possible I advised her to begin an exercise program possibly aquatic therapy which might improve her functional status, obesity, and possibly her chronic pain and that if she could get into an exercise routine we might be able to slowly decrease some of her pain medications, anti-depressants; and possibly her blood pressure meds as well. I also believe that her polypharmacy probably contributes to her other multiple complaints however it is clear that we could not just stop any of her medications cold turkey. Since she has been dealing with these issues for well over 8 years she agrees that an attempt to improve her overall functional status could possibly result in better sleep and a reduction in her multiple medications and she is more than willing to give that a try. I will try to have her see a physical therapist here at Hospital for Special Care who she is familiar with but has not seen in some time to do an evaluation for an exercise program which would concentrate on aquatic therapy.

*Id.* ¶ 71.

On November 17, 2020, Kristin W. went to the Hospital for Special Care for physical therapy service. *Id.* ¶ 72.

On November 18, 2020, Kristin W. saw Dr. Micalizzi for seizure and migraine disorders. *Id.* ¶ 73.

On February 2, 2021, Dr Brietberg noted that Kristin W. met with a psychiatrist who prescribed her Wellbutrin for hopelessness. *Id.* ¶ 74.

### 3.   Medical Source Statement

On August 13, 2019, Dr. Alaina Breitberg (also known as Dr. Breitberg-Hammond or Dr. Hammond) provided a medical source statement on a state agency form. *Id.* ¶ 75. Dr. Breitberg had been treating Kristin W. for almost six months and she diagnosed her with Post-traumatic stress disorder, Major depressive disorder recurrent without psychosis, Auto-immune disease, Acute systemic lupus erythematosus, Cutaneous lupus erythematosus, and Mild cognitive impairment with memory loss. *Id.*

Dr. Breitberg wrote that "Pt continues to have sporadic passive suicidal thoughts but no active thoughts of self-harm and/or suicidal behavior" and she listed Thought Content as "mild paranoia towards others due to longstanding trauma flashbacks of mother's 'burned floating head' severe emotional dysregulation due to trauma." Tr. at 1863. Dr. Breitberg listed Judgement and Insight as "listed impaired, depending on the moment pt can present with fair insights and judgement that deteriorates due to emotional vulnerability and instability." *Id.*

### 4.        Plaintiff's Testimony

At her administrative hearing on March 11, 2021, Kristin W. testified, in relevant part, "[I] left the job because I was dealing with lupus and being immune compromised. Also, dealing with very severe chronic pain. And despite the – using the sit to stand workstation, I kept getting

sick with different infections, including five C difficile infections, where that causes you to need to use the restroom at least seven to ten times a day. And would often have accidents as my desk. And then, I just got so sick I couldn't keep up with the workload, and despite all the help of my coworkers, I kept falling further and further behind. I was falling asleep at my desk. I was getting more depressed because I was failing as a social worker. And I just felt ethically that I was not providing appropriate care to my patients and contacted my rheumatologist. And he agreed with me taking, at least, at that time, a year off." Tr. at 73.

Kristin W. also testified that "I still deal with severe chronic pain. We've tried changing the medication. I have to change position about every 20 to 30 minutes. I have to change position. I wake up in so much pain in the morning that I – I just cry and cry if I didn't have my service dog, honestly, I wouldn't get out of bed. I'm very depressed. I struggle with daily suicidal ideation." *Id.*

### 5. Vocational Expert Testimony

Mary Vasishth testified as the vocational expert at Kristin W.'s administrative hearing. The ALJ presented Vasishth with the following hypothetical question:

> Suppose you had a hypothetical person who was the same age education, experience as the claimant, and that person could perform their work at the light exertional level. Further, the person could stand and walk up to four hours during each eight-hour workday. In addition, the person could occasionally reach overhead with their bilateral upper extremitites. Further the person can frequently climb ramps and stairs; cannot climb ladders, ropes, or scaffolds; can occasionally balance, occasionally balance, occasionally stilt, occasionally kneel, occasionally crouch, and occasionally crawl. Further the person must avoid concentrated exposure to extreme cold, and the person cannot work at unprotected heights, cannot operate machinery having moving mechanical parts, which are exposed, and cannot operate a motor vehicle. Further the person can perform simple, routine tasks but not at a strict production-rate pace and can recall and execute simple, routine instructions. The person can tolerate occasional

> brief interaction with the general public, and finally, the person
> cannot engage in tasks requiring close collaboration with
> coworkers . . .   Now if you had a hypothetical person who was the
> same, education, experience as the claimant, and that person had
> the limitations of hypothetical #1, could the hypothetical person
> perform any of the claimant's prior work that you testified about?

Tr. at 87. Vocational Expert Vasishth responded, "No, Your Honor. None of it is simple and

routine." *Id.* at 88. The ALJ then asked Vocational Expert Vasishth "Could the same

hypothetical person with the limitation of hypothetical #1 perform any jobs that are available in

the national economy?" *Id.* And the ALJ then asked Vocational Expert Vasishth to list those

jobs. Vocational Expert Vasishth responded:

> the first position to illustrate an example of this hypothetical, this is
> not an exhaustive list, would be a photocopying machine operator,
> and that Dictionary of Occupational Title's code is 207.685-014. It
> is unskilled work, SVP2, light exertional level. There are
> approximately 21,000 full-time positions nationally. An office
> helper [cite to DOT code]. And there are approximately 20,000
> full-time positions nationally. A price marker [cite to DOT code] . .
> . normally, there are 306,000 full-time positions nationally.
> However, given the need to sit four hours versus stand and walk,
> I'm eroding this by 50%, which would leave 153,000 full-time
> positions nationally.

*Id*. at 88-89. Vocational Expert Vasishth also testified that for all three of the above-listed jobs

"being off-task 15% of the workday would, in fact preclude all competitive employment. An

employer may tolerate that for some time, but not on a sustained basis." Tr. at 90-91. "Being two

days absent [per month] on average would, in fact, preclude all competitive employment on a

sustained basis." *Id.* at 91.

### 6.   The ALJ's Decision

At Step One, the ALJ found that Kristin W. had not engaged in substantial gainful

activity since January 9, 2019, the alleged onset date. Tr. at 39.

At Step Two, the ALJ found that Kristin W. had the following severe impairments: generalized anxiety disorder, major depressive disorder, post-traumatic stress disorder, an adjustment disorder, a bipolar disorder, a cognitive impairment, lupus, chronic pain syndrome, chronic fatigue syndrome, degenerative disc disease of the lumbar spine, obesity, a seizure disorder, and epicondylitis of left elbow. *Id.* at 40. The ALJ found that these impairments that Kristin W. had were "severe under the Commissioner's regulations because they significantly limit the claimant's physical abilities to perform basic work activities" such as the following:

> • Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling
> • Capacities for seeing, hearing, and speaking
> • Understanding, carrying out, and remembering simple instructions
> • Use of judgment
> • Responding appropriately to supervision, co-workers, and usual work situations, and
> • Dealing with changes in a routine work setting

*Id.* The ALJ concluded that "[u]nder Social Security Administration regulations, an impairment met or equaled the severity of one of the Commissioner's listed impairments." *Id*.

At Step Three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. Def. Mot. at 5; Tr. at 41.

At Step Four, the ALJ found that Plaintiff was unable to perform any past relevant work. *Id.* at 50.

At Step Five, the ALJ found that Plaintiff could perform other work in the national economy. *Id.* at 51.

Accordingly, the ALJ concluded that Plaintiff was not disabled from her alleged onset date to the date of the ALJ's decision. *Id.* at 52.

### B.  Procedural History

On April 26, 2022, Plaintiff filed her Complaint under 42 U.S.C. § 405(g), seeking

review of the Commissioner's final decision denying her applications. Compl.

On August 9, 2022, Plaintiff filed a motion to reverse the decision of the Commissioner.

Pl. Mot.

On October 21, 2022, the Commissioner filed a motion to affirm her decision. Def. Mot.

## II.    STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court reviewing a disability determination "must

determine whether the Commissioner's conclusions 'are supported by substantial evidence in the

record as a whole or are based on an erroneous legal standard.'" *Schaal v. Apfel*, 134 F.3d 496,

501 (2d Cir. 1998) (quoting *Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997)); *see also*

*Moreau v. Berryhill*, No. 3:17-cv-396 (JCH), 2018 WL 1316197, at *3 (D. Conn. Mar. 14, 2018)

("[T]he court may only set aside the ALJ's determination as to social security disability if the

decision 'is based upon legal error or is not supported by substantial evidence.'" (quoting

*Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998))).

"Substantial evidence is 'more than a mere scintilla.'" *Brault v. Soc. Sec. Admin.,*

*Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam) (quoting *Moran v. Astrue*, 569 F.3d 108,

112 (2d Cir. 2009)). "It means such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Moran*, 569 F.3d at 112 (quoting *Burgess v. Astrue*, 537 F.3d

117, 127 (2d Cir. 2008)). It is a "very deferential standard of review—even more so than the

'clearly erroneous' standard." *Brault*, 683 F.3d at 448 (citing *Dickinson v. Zurko*, 527 U.S. 150,

153 (1999)).

## III.     DISCUSSION

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

To determine whether a claimant is disabled under the Social Security Act, an ALJ must perform a five-step evaluation. As the agency explains:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled . . . ;
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled . . . ;
>
> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled . . . ;
>
> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled . . . ;
>
> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled . . . .

20 C.F.R. § 404.1520(a)(4).

Plaintiff presents five arguments. First, she argues that the Administrative Record was not developed. Mem. of Law in Support of Pl.'s Mot. to Reverse the Decision of the Comm'r, ECF.

No. 13-2, 1 ("Pl. Mem."). Second, she argues that the ALJ's Step Two findings were "irredeemably flawed." *Id*. at 11. Third, she argues that the ALJ's chronic pain and "combination of impairments" analysis was deficient. *Id*. at 14. Fourth, she argues that the ALJ's finding at Step Five were unsupported. *Id.* at 16. Fifth, she argues that ALJ Aletta, who heard and decided the case, was not properly appointed under the U.S. Constitution. *Id.* at 23.

### A.  The Development of the Administrative Record

"The claimant has the general burden of proving that he or she has a disability within the meaning of the Act and bears the burden of proving his or her case at steps one through four of the sequential five-step framework." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (citation and internal quotation marks omitted). Nonetheless, "[b]ecause a hearing on disability benefits is a nonadversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." *Id.* (alteration in original) (internal quotation marks omitted).

"Whether the ALJ has satisfied this duty to develop the record is a threshold question" that the Court must consider "[b]efore determining whether the Commissioner's final decision is supported by substantial evidence under 42 U.S.C. § 405(g)." *Jackson v. Kijakazi*, 588 F. Supp. 3d 558, 577 (S.D.N.Y. 2022); *see also Moran v. Astrue*, 569 F.3d 108, 114–15 (2d Cir. 2009) ("We vacate not because the ALJ's decision was not supported by substantial evidence but because the ALJ should have developed a more comprehensive record before making his decision.").

The duty to develop the record requires an ALJ to "seek additional evidence or clarifications from medical sources when documentation in the record is insufficient to determine whether the claimant is disabled." *Acosta Cuevas v. Comm'r of Soc. Sec.*, No. 20-cv-0502 (AJN) (KHP), 2021 WL 363682, at *10 (S.D.N.Y. Jan. 29, 2021) (quoting *Sanchez v. Comm'r of Soc.*

*Sec.*, No. 18-cv-2027 (KMK), 2019 WL 4673740, at *8 (S.D.N.Y. Sept. 25, 2019)), *report and recommendation adopted*, 2022 WL 717612 (S.D.N.Y. Mar. 10, 2022). "This duty is particularly important where a claimant alleges disability due to mental illness." *Id.*

On the other hand, "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999) (internal quotation marks omitted).

Plaintiff argues that "the Record before the Court demonstrates that Dr. Tendler, Dr. Grille (and APRN Maloney), Dr. Micallizi, Dr. Honor, and Dr. Byeff had all treated [Kristin W.] for approximately three years prior to the hearing, and yet no medical source statements from any of these physicians are before the Court. Similarly, Dr. Votto and Dr. Cromer had treated [Kristin W.] for clinically significant periods of time, yet no medical source statement from either of them is before the Court. And despite clear evidence that Dr. Meadows Chen and Dr. Yousong Wang were actively involved in [Kristin W.]'s treatment during the period at issue, the Record does not contain any medical documentation whatsoever from these physicians, let alone medical source statements." Pl. Mem. at 8. Plaintiff argues that "[t]he need for medical source statements was particularly acute in this case given the complexity of the claim and the many conditions [Kristin W.] has suffered from." *Id.* at 5. Plaintiff argues that this gap in the record is prejudicial because "existing medical records from all of the physicians/clinicians treating [Kristin W.]'s multiple conditions are unrevealing as to her function-by-function capacities." *Id.* at 3.

In response, the Commissioner argues that the ALJ was not required to obtain medical source statement from any other providers. Def. Mot. at 3. The Commissioner argues that under

current regulations if there are no obvious gaps in the administrative record, the ALJ is not required to seek additional information before denying a claim. *Id.* The Commissioner alleges "the ALJ relied heavily on the findings of [state agents] Drs. Augenbraun, Kuslis, Leveille, Rimm, [citation], who considered extensive evidence from the sources Plaintiff emphasizes. *Id.* at 5. Additionally, the Commissioner argues that the Plaintiff has failed to show harm, and thus the ALJ made no reversible error. *Id.* at 7. The Commissioner argues that the agency "requested statements on work-related abilities from many of Plaintiff's providers [. . .] The fact that none were provided does not require remand." Def. Mot. at 4.

The Court disagrees.

While the ALJ did have "more than 2,600 pages of evidence documenting Plaintiff's medical history," Def. Mot. at 4, a gap exists in this record on the interplay and cumulative effect of Plaintiff's physical and mental health on her ability to work. For example, not long after the onset date of disability, *see Burch v. Commissioner of Social Security*, 1:15-cv-9350 (GHW), 2017 WL 1184294 at *16 (S.D.N.Y. March 29, 2017) (recognizing the significance of medical evidence after the onset date of disability where such evidence was probative of the claimant's condition during the relevant period), a number of medical providers discussed the link between her mental health and her likely capacity to work. *See, e.g.*, Tr. at 1370 ( "I absolutely feel that Kristin is not currently able to perform her job because of the disability related to her active multiple medical problems and the resultant severe depression that she is suffering from."); *id.* at 1360 ("Kristin's medical, cognitive and psychiatric co-morbidities make it impossible for her to function in any type of work environment."). Indeed, the record contains repeated references to

Kristin W.'s mental health issues, most importantly, her own suicidal ideation as well as a family history of suicide following her mother's own significant mental health challenges.[2]

Yet, the ALJ failed to develop the record of Kristin W.'s mental health history and its relationship with her many physical diagnoses. Instead, in discussing her ability to work, there is a discussion largely focused on her physical capabilities to work. *See* Tr. at 46-50 (discussing in detail her various physical ailments). In contrast, one paragraph summarizes mental health impairments, *id.* at 48, and a single sentence in the ALJ's conclusions about her abilities addresses a topic replete in the records both before and after the onset date of disability: "There was no auditory or visual hallucinations, paranoid suicidal, or homicidal ideations." Tr. at 50.

Here, the ALJ needs to fill the gap in the record to determine the effects of Kristin W.'s mental health issues, if any, on her ability or inability to work. *Cf. Andrew M. v. Comm'r of Soc. Sec.*, No. 3:19-CV-01702 (SRU), 2021 WL 1040480, at *6 (D. Conn. Mar. 18, 2021) ("the ALJ cannot determine that Andrew's mental impairments 'cause no more than mild limitation in any of the functional areas' without first attempting to fill the obvious gaps in the record."); *Darden v. Saul*, No. 3:19-CV-891 (SRU), 2020 WL 6293023, at *12 (D. Conn. Oct. 26, 2020) ("remand is warranted for additional development of the record and procurement of treating source

---

[2] *See e.g.* Mother committed suicide by "burning herself in her home by an explosion using paint thinner and fire," Tr. at 1354; "Patient's mother suffered from bipolar disorder and maladaptive personally traits such that she became hurtful when depressed. When the patient was 19-years-old her mother committed suicide by burning herself." Tr. at 1398; "Growing up, it was difficult for her especially that her mother would frequently put her down and would threaten suicide. Her mother committed suicide by burning herself to death," Tr. at 1555; "[Kristin W.] is a 44 y.o. female with GAD, MDD, persistent depressive disorder who presented to ED with SI with plan to jump off building or overdose on medications. Her depression and anxiety have worsened with intensifying suicidality associated with Intent and plan to harm herself. She has a strong family history of depression and suicidality. In fact her mother burned herself to death," Tr. at 1557; "Patient discussed how she continues to see images of her burned mother flash in her mind and that she is unable to remember her mother in any other way," Tr. at 1533; "Pt discussed her ongoing flashbacks of her mother's burned body while watching TV," Tr. at 2536; "Pt discussed seeing her mother's 'burned floating head' whenever she becomes emotionally activated," Tr. at 2575; "pt reported increased flashbacks of her mother's burned head floating in space," Tr. at 2670. State agency Psychologist Christopher Leveille, reviewed the record and included his read of Dr. Cromer's 2019 psych evaluation: "Hx includes suicide by her bipolar mother by means of fire." Tr. at 120.

opinions pertaining to Darden's mental impairments."); *Jaime N. v. Kijakazi*, No. 3:20CV676 (MPS), 2021 WL 4077487, at *5 (D. Conn. Sept. 8, 2021) ("where the record evidence as to the severity of the Plaintiff's impairments was sparse, the absence of a date, and the apparent absence of a formal signature, on the assessment created a clear gap in the record the ALJ should have sought to fill."); *Faussett v. Saul*, No. 3:18CV738 (MPS), 2020 WL 57537, at *5 (D. Conn. Jan. 6, 2020) ("the ALJ failed to adequately develop the record. Although, as the defendant points out, the ALJ requested the plaintiff's medical records, a gap remained where she had treatment notes and test results but no assessment of the plaintiff's functional abilities and limitations.").

Because further information on Plaintiff's mental health in combination with her physical condition could very well undermine the ALJ's decision, the Commissioner's failure to develop the record in this way cannot be considered harmless. *Cf. Christopher S. v. Kijakazi*, No. 3:20-CV-00753 (JCH), 2021 WL 4460254, at *11 (D. Conn. Sept. 29, 2021) ("Because such gaps remain, the failure to develop the record by not securing such an opinion from PA Humphrey was not harmless error."); *Andrew M. v. Comm'r of Soc. Sec.*, No. 3:19-CV-01702 (SRU), 2021 WL 1040480, at *8 (D. Conn. Mar. 18, 2021) ("several indications that the defects in the medical records were not harmless, and instead had a real impact on the outcome of Andrew's case. First, the ALJ determined that Andrew's depression and anxiety disorder were non-severe impairments . .")

Accordingly, the decision of the Commissioner will have to be vacated, and the case will have to be remanded, in order for the administrative record to be supplemented with information

during the relevant period, both before and after the onset date, regarding Kristin A's mental health and the impact, if any, on her capacity to work.[3]

Accordingly, because of the remand already required, the other issues will not be resolved now.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiff's motion is **GRANTED**, and the Commissioner's motion is **DENIED**. The decision of the Commissioner is **VACATED** and **REMANDED** for further proceedings consistent with this Ruling and Order.

**SO ORDERED** at Bridgeport, Connecticut, this 29th day of September, 2023.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE

---

[3] As the Court will remand this case to fully develop the record, it will not reach the other issues Plaintiff raises. *See Christopher S. v. Kijakazi*, No. 3:20-CV-00753 (JCH), 2021 WL 4460254, at *12 (D. Conn. Sept. 29, 2021) ("Because the record was not fully developed, the court does not reach the other issues raised by Christopher or assess whether the ALJ's findings were supported by substantial evidence."); *Jaime N. v. Kijakazi*, No. 3:20-CV-676(MPS), 2021 WL 4077487, at *5 (D. Conn. Sept. 8, 2021) ("I do not reach Plaintiff's other arguments because upon remand and after a de novo hearing, [the ALJ] shall review this matter in its entirety.") (citations omitted).